IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

WILLIAM LESTER BANKS,
      **Plaintiff,**

v.                             **Civil Action No. 1:14CV98**
                              **(The Honorable Irene M. Keeley)**

COMMISSIONER OF SOCIAL SECURITY,
      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

William Lester Banks ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for

judicial review of the final decision of the Commissioner of the Social Security Administration

("Defendant," and sometimes "the Commissioner") denying the Plaintiff's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision

on cross motions for summary judgment and has been referred to the undersigned United States

Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28

U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on July 14, 2011, alleging disability since

July 14, 2010[1], due to permanent spinal cord injury and mild depression[2] (R. 18, 131, 142, 146).

Plaintiff's applications were denied at the initial and reconsideration levels (R. 66, 76). Plaintiff

requested a hearing, which Administrative Law Judge ("ALJ") Phylis M. Pierce held on April 3,

---

[1]Plaintiff's onset date was amended to October 16, 2011, at the administrative hearing (R. 35).

[2] In his brief, Plaintiff has only presented arguments regarding his physical impairments. Accordingly, the undersigned has focused solely on Plaintiff's medical records concerning his physical limitations, not mental limitations, for the relevant time period.

2013 (R. 30). Plaintiff, represented by counsel, Alan Nuta, testified on his own behalf (R.30, 34-49). Also testifying was Vocational Expert ("VE") Robert Lester (R. 30, 49-55). On April 18, 2013, the ALJ entered a decision finding Plaintiff was not disabled and could perform light work (R. 18-26). Plaintiff filed a timely appeal of the ALJ's decision, and, on April 9, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-6, 14).

## II. FACTS

Plaintiff was born on February 18, 1958, and was fifty-five (55) years old at the time of the administrative hearing (R. 34, 131). He obtained his GED in 1985 and has past relevant work as a ranger for the United States Park Service (R. 146-47).

On April 7, 2009, Dr. Yalamanchili examined Plaintiff relative to his September 16, 2004 C3 through C6 anterior cervical diskectomy and osteophytechtomies, with fusion, and found Plaintiff was "getting better and [was] intact neurologically." Plaintiff stated he had been "doing well until last Tuesday when he had sudden severe pain on the right side of his neck." Plaintiff's motor strength was 5/5 in all extremities. His sensory examination was "intact to pinprick." Plaintiff had "good range of motion of his neck in all planes." He had a "mild amount of spasm over the right trapezial ridge." Dr. Yalamanchili instructed Plaintiff to "continue conservative measures for now" (R. 235).

On October 5, 2010, Plaintiff presented to P.A. Zuniga with complaints of upper back pain. Plaintiff stated he "may have pulled something in his back about two weeks ago." He had pain and tightness in his neck and upper back. The pain, according to Plaintiff, radiated from his thoracic spine to his neck. It was "constant, moderate in intensity, sharp, stabbing, and cramping." Except for back pain, Plaintiff's examinations were normal (R. 262). He had decreased range of motion of

his neck and back pain with flexion and extension. He was diagnosed with upper back pain and prescribed Flexeril, Ibuprofen, and Ultram (R. 264).

Plaintiff presented to Dr. Reyna on October 20, 2010, with complaints of cervical spine pain, which radiated to his left shoulder. The pain was constant; he "note[d] some pain relief with NSAIDs." Except for back and neck pain, Plaintiff's examination was normal (R. 266). Plaintiff medicated with Nexium, Flexeril, and Ibuprofen. He had decreased range of motion of his neck and back pain with flexion and extension. Dr. Reyna diagnosed upper back pain. He refilled Plaintiff's prescription for Ibuprofen (R. 268).

Plaintiff described his back pain as "intermittent and mild in severity" to Dr. Reyna during his November 3, 2010, office visit. Ibuprofen made his condition "a little better." He realized pain relief with "rest, heat, . . . and muscle relaxants." Dr. Reyna's review of Plaintiff's systems were negative (R. 269). Dr. Reyna noted Plaintiff had no mental health history (R. 270). Plaintiff medicated with Nexium, Ibuprofen, and Flexeril. Plaintiff's examinations were normal, except he had decreased range of motion of his neck and pain with back flexion and extension. Dr. Reyna diagnosed mixed hyperlipidemia, upper back pain, depression with anxiety, gastroesophageal reflux disease ("GERD"), and lower back pain (R. 271).

Plaintiff's November 12, 2010, cervical spine MRI showed his spinal cord was "normal in appearance." The results were as follows: C2-C3 was normal; C3-C4 was fused and showed a "small persistent and chronic posterior disc osteophyte complex unchanged from before"; C4-C5 showed a "[s]mall posterior disc osteophyte complex" that was unchanged, "moderate bilateral foraminal narrowing," and "small focal area of hyperintensity within the spinal cord on the left side"; C5-C6 was normal; C6-C7 showed a "prominent posterior disc osteophyte complex with moderate

central stenosis and moderate bilateral foraminal narrowing greater on the right"; and C7-T1 was normal (R. 219, 321). Plaintiff's lumbar MRI was unremarkable (R. 221, 322).

Plaintiff presented to Dr. Yalamanchili on November 16, 2010, with complaints of severe neck pain and "electric shocks" when he "took his head down." Plaintiff stated he could not "do his job because of the intensity of his symptoms." Plaintiff stated his neck was "stiff all the time." Dr. Yalamanchili found Plaintiff's motor strength was 4+/5 in his arms. His sensory exam was intact to pinprick. His reflexes were spastic. He had "spreading of the brachioradialis reflex bilaterally." Plaintiff's Hoffmann sign was positive, bilaterally. He had "a positive Lhermitte." Dr. Yalamanchili reviewed the "films with [Plaintiff] that show[ed] that he now has a significant large C6-C7 disc herniation causing cord compression." Dr. Yalamanchili found Plaintiff had "changes of myelomalacia superior to this from his previous injury." Dr. Yalamanchili opined Plaintiff should not "go through physical therapy" because of his "significant stenosis," which put him in "danger of worsening . . . his condition." Plaintiff decided to proceed with the C6-C7 anterior cervical diskectomy and fusion that Dr. Yalamanchili recommended (R. 236).

Plaintiff presented to Dr. Reyna on December 3, 2010, with complaints of depression and anxiety. His symptom was "anxious mood." Plaintiff stated he experienced posterior neck pain. His GERD was controlled with medication; he complied with his treatment of hyperlipidemia. Upon examination, Dr. Reyna found Plaintiff was positive for anxiety and neck pain (R. 273). Plaintiff had decreased range of motion of his neck with forward flexion and extension. Dr. Reyna diagnosed depression with anxiety, GERD, mixed hyperlipidemia, and neck pain (R. 275).

Plaintiff presented to Dr. Reyna on December 13, 2010, with depression and anxiety. Dr. Reyna found Plaintiff's examinations were normal. Specifically, he was "negative" for arthralgias,

back pain, myalgias, anxiety, depression, feelings of stress, sadness, sleep disturbance, or suicidal thoughts (R. 230). Plaintiff reported he had previously been addicted to Darvocet; he drank alcohol on a "social basis only" (R. 231). Plaintiff medicated with Nexium and Oxycodone. Upon examination, Dr. Reyna found Plaintiff had decreased range of motion of his neck. He had appropriate affect and demeanor. His insight and judgment were good. Dr. Reyna diagnosed Plaintiff with neck pain, depression with anxiety, GERD, and mixed hyperlipidemia (R. 232).

On December 14, 2010, Dr. Yalamanchili diagnosed Plaintiff with C6-7 disk herniation and spinal cord compression; he performed a C6-7 diskectomy and fusion. He removed Plaintiff's "previous anterior cervical plate" from the September 16, 2004, C3 through C6 anterior cervical diskectomy and osteophytechtomies (R. 201, 203-04, 223-28, 233-34).

Plaintiff's cervical spine x-ray, made on December 30, 2010, showed no evidence of hardware complications (R. 218).

Plaintiff reported to Dr. Yalamanchili on January 4, 2011, that he had experienced "excellent relief of his neck pain and arm pain" but had weakness. Dr. Yalamanchili found Plaintiff's motor strength was 4+/5 in all extremities and his gait was normal. Dr. Yalamanchili noted the surgery resulted in "excellent graft and plate placement and alignment." He was making "good recovery from surgery." Dr. Yalamanchili prescribed Percocet and Valium and instructed Plaintiff to "take antiinflammatories after that" and return to "see" him "should there be any problems . . ." (R. 237).

Plaintiff reported to Dr. Reyna, on January 7, 2011, that his depression and anxiety were improving. Nexium improved his GERD symptoms (R. 276). Plaintiff had decreased range of motion of his neck and back pain. Dr. Reyna diagnosed mixed hyperlipidemia, GERD, lower and upper back pain, depression, and anxiety (R. 278).

On January 28, 2011, Plaintiff reported to Dr. Reyna that he had chronic low back pain. Dr. Reyna's review of Plaintiff's systems produced negative results (R. 280). Plaintiff medicated with Nexium, Valium, and Oxycodone. Plaintiff was positive for decreased range of motion of his neck and back pain (R. 282). Dr. Reyna prescribed Oxycodone (R. 283).

On February 15, 2011, Plaintiff informed Dr. Yalamanchili that his neck pain had "completely resolved." He continued to have arm and leg weakness. Plaintiff's strength was 4/5 in both upper and lower extremities, bilaterally. Dr. Yalamanchili prescribed Percocet for one (1) month and instructed Plaintiff to medicate with Advil or Motrin or "plain Tylenol" (R. 238).

On March 11, 2011, Plaintiff informed Dr. Reyna that his recovery from back surgery was "slow and painful." He described his upper back pain as "intermittent and mild in severity." His pain was constant. Nexium controlled his GERD; he was compliant with his hyperlipidemia medications (R. 284). Plaintiff medicated with Nexium, Lipitor, Oxycodone, and Valium. Plaintiff had decreased range of motion of his neck and back pain. Dr. Reyna diagnosed upper back and neck pain, GERD, and mixed hyperlipidemia and gave Plaintiff samples of Cymbalta (R. 286-87).

Dr. Yalamanchili wrote a letter, directed "To Whom It May Concern," on April 6, 2011, asserting that Plaintiff was "still recuperating from the spinal cord damage that was done with his initial injury." Plaintiff could not "go back to work on an unrestricted basis should that require lifting/pushing/pulling over 10 pounds" (R. 229).

Plaintiff presented to Dr. Reyna on April 20, 2011, with complaints of neck pain. Cymbalta did not alleviate his symptoms but Nexium relieved his GERD symptoms. Dr. Reyna's review of Plaintiff's systems produced negative results (R. 288). Plaintiff medicated with Nexium, Lipitor, and Cymbalta. Plaintiff was positive for decreased range of motion of his neck and back pain. Dr.

Reyna diagnosed mixed hyperlipidemia, GERD, depression, anxiety, vitamin D deficiency, and neck pain (R. 290). Dr. Reyna prescribed Hydrocodone and referred Plaintiff to a pain clinic (R. 291).

Plaintiff was examined by Dr. Yalamanchili on May 3, 2011. Dr. Yalamanchili diagnosed Plaintiff with hyperreflexia and 4+/5 strength in his arms." Plaintiff had limited range of motion of his neck in all planes. His gait was normal. Dr. Yalamanchili found Plaintiff had a "permanent spinal cord injury" and had to "stay on his current work restrictions permanently" (R. 240).

Dr. Nathan examined Plaintiff on May 10, 2011, for complaints of neck pain, bilateral shoulder pain, and arm pain. Plaintiff stated his pain radiated to both shoulders and he experienced residual pain from his two prior cervical disk surgeries. Plaintiff stated he had numbness and weakness in his arms and legs. Dr. Nathan found Plaintiff was positive for depression and anemia. He medicated with Nexium, Valium, and Hydrocodone. Plaintiff was five feet, eight inches (5'8"), weighed one-hundred, twenty-five (125) pounds, and was left handed. He was oriented; his speech was normal; his memory was normal; he had good strength in both arms and legs; his sensory examination was normal; his deep tendon reflexes were brisk in both arms and legs, "except for 1-ankle jerk on both sides"; and his plantar responses were normal on both sides. Dr. Nathan diagnosed degenerative disk disease from C3 to C7 and myelopathy. Dr. Nathan opined "[n]o further surgery will help him," and Plaintiff should "continue with nonsurgical treatment" (R. 207).

On May 16, 2011, Plaintiff was treated by Dr. Reyna for generalized anxiety and neck pain. Dr. Reyna's review of Plaintiff's systems was negative (R. 292). Plaintiff medicated with Nexium, Lipitor, vitamin D, Cymbalta samples, and Hydrocodone. Plaintiff was positive for decreased range of motion of his neck and back pain. Dr. Reyna diagnosed mixed hyperlipidemia, GERD, generalized anxiety, depression, neck pain, and C5-C7 spinal cord injury with complete lesion of

spinal cord (R. 294). Dr. Reyna prescribed Hydrocodone (R. 295).

Plaintiff presented to the emergency department of West Virginia University Hospitals-East on June 2, 2011, with complaints of left leg and left shoulder pain. He could ambulate independently (R. 208). He had no numbness or tingling. Plaintiff reported he medicated with Nexium, Percocet, and Lipitor. Plaintiff stated he drank alcohol occasionally (R. 214). Plaintiff showed no distress. His examination was normal with normal range of motion. He had tenderness to palpation of his left shoulder and humeral area. He was neurovascularly intact (R. 215). His shoulder x-ray was normal, except for a rod in the left humerus (R. 215, 217). Plaintiff was instructed to continue his current medications and ice the area where the pain was located (R. 215).

Plaintiff reported to Dr. Yalamanchili on June 21, 2011, that he had a "difficult time with his employer"; he still had to "fight with them about getting restricted duties." Dr. Yalamanchili found Plaintiff's neurologic examination was unchanged from his previous examination. Dr. Yalamanchili informed Plaintiff that his "spinal cord injury [was] most likely a permanent sequelae" (R. 241).

Plaintiff reported to Dr. Reyna on June 27, 2011, that work was "tough." He continued to have pain but medication helped ease it. Cymbalta caused Plaintiff to be depressed. His mood was anxious. Dr. Reyna's review of Plaintiff's systems produced normal results (R. 296). Plaintiff medicated with Lipitor, Nexium, vitamin D, and Hydrocodone. He had decreased range of motion of his neck and back pain (R. 298). Dr. Reyna diagnosed GERD, mixed hyperlipidemia, lower back pain, depression, vitamin D deficiency, and C5-C7 level spinal cord injury with complete lesion of spinal cord (R. 298-99).

Plaintiff began care at the Martinsburg Veterans Administration ("VA") on July 8, 2011. Plaintiff stated he had lost weight due to stress and loss of appetite. He experienced severe pain; his

wife had to assist him when he dressed (R. 379). Plaintiff reported he medicated with Lipitor, Nexium, Diazepam, and Hydrocodone (R, 380). Plaintiff rated his pain at ten (10) at its worst and five (5) at its least. "Normal activities" exacerbated his pain; nothing lessened it (R. 381). Plaintiff had not fallen during the past year; he did not experience dizziness (R. 382).

On July 19, 2011, Plaintiff reported to Dr. Yalamanchili that he thought he had "more neck pain." Dr. Yalamanchili found Plaintiff's examination was unchanged "with continued myelopathy and spasticity." Dr. Yalamanchili opined he had "nothing further from a surgical standpoint to offer" Plaintiff and referred him to a pain clinic. Plaintiff informed Dr. Yalamanchili he continued to have "trouble at work and . . . he [was] being pushed out the door"; therefore, Plaintiff planned to apply for disability retirement (R. 242).

On August 5, 2011, Plaintiff presented to Dr. Reyna for anxious mood, GERD that was controlled with Nexium, spinal cord injury, and hyerlipidemia. Plaintiff reported he was on leave from his employment and had "seen a therapist at VA." Dr. Reyna's review of Plaintiff's systems produced normal results (R. 300). Plaintiff medicated with Lipitor, Nexium, vitamin D, and Hydrocodone. He had decreased range of motion of his neck and back pain. Dr. Reyna diagnosed GERD, mixed hyperlipidemia, depression, and C5-C7 level spinal cord injury with complete lesion of spinal cord (R. 302). He prescribed Hydrocodone (R. 303).

Plaintiff reported to Dr. Reyna on August 23, 2011, that he had returned to work with "limitations." Plaintiff's vitamin D deficiency was "worsening." Nexium alleviated his GERD symptoms. His spinal cord symptoms were "severe." Dr. Reyna's review of Plaintiff's symptoms produced normal results (R. 304). Plaintiff medicated with Lipitor, Nexium, vitamin D, and Hydrocodone. He had decreased range of motion of his neck and back pain (R. 306). Dr. Reyna

diagnosed GERD, mixed hyperlipidemia, depression with anxiety, vitamin D deficiency, and C5-C7 level spinal cord injury with complete lesion of spinal cord. He prescribed Celexa (R. 307).

Plaintiff presented to Dr. Cincinnati on August 30, 2011, with complaints of left shoulder pain. Upon examination, Dr. Cincinnati found Plaintiff's range of motion of his left shoulder was one-hundred, forty (140) degrees forward flexion and one-hundred, ten (110) degrees abduction. Plaintiff had increased pain and weakness during testing. Plaintiff had numbness and tingling in his fingers. He was, otherwise, neurovascularly intact. Dr. Cincinnati ordered a MRI (R. 401).

Plaintiff's September 7, 2011, MRI of his left shoulder was limited due to the Rush rod in his humerus (R. 414).

Plaintiff was examined by Dr. Cincinnati for left shoulder pain on September 14, 2011. The MRI was unreadable. Dr. Cincinnati ordered a CT scan (R. 399).

Plaintiff's September 20, 2011, CT scan of his left shoulder showed "[f]ocal full thickness tear of the distal supraspinatus tendon, with leakage of contrast into the subacromial bursa" and no retraction. The CT scan also showed an intramedullary rod at the humeral neck (R. 413).

On September 22, 2011, Dr. Atiya Lateef, a State agency physician, conducted an assessment of Plaintiff's residual functional capacity. She found that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk, and sit for six (6) hours in an eight (8)-hour work day; and had no restrictions in pushing and pulling. Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl (R. 62-63). Dr. Lateef noted that Plaintiff needed to avoid concentrated exposure to extreme cold, vibration, and hazards. She determined that Plaintiff still retained the ability to perform light work (R. 63).

On September 26, 2011, Plaintiff reported to Dr. Reyna that he had left shoulder pain that radiated to his arm. Dr. Reyna's review of Plaintiff's systems produced normal results (R. 308, 312). Plaintiff medicated with Lipitor, Nexium, vitamin D, Celexa, and Hydrocodone. He had decreased range of motion of his neck and back pain. Dr. Reyna diagnosed GERD, mixed hyperlipidemia, shoulder pain, vitamin D deficiency, and C5-C7 level spinal cord injury with complete lesion of spinal cord (R. 310, 314).

Dr. Cincinnati examined Plaintiff's left shoulder on September 27, 2011. He had functional range of motion of his shoulder. Dr. Cincinnati reviewed Plaintiff's CT scan and found left rotator cuff tear, the presence of a prominent Rush rod, and posttraumatic changes in the humerus. Dr. Cincinnati recommended Plaintiff undergo an "open decompression, removal of the Rush rod, and rotator cuff repair." Plaintiff agreed (R. 398).

Dr. Gallagher, a pain management specialist, corresponded with Dr. Yalamanchili on October 11, 2011, relative to Plaintiff's treatment. She wrote that "there were not any interventions [she] could offer him secondary to the surgical procedures he has had" (R. 245).

Dr. Cincinnati removed Plaintiff's "prominent internal fixation, left proximal humerus (Rush rod" and repaired Plaintiff's left rotator cuff tendon (R. 395). The final diagnosis from the pathologist was left shoulder bursitis (R. 397).

Plaintiff's October 26, 2011, lumbar spine x-rays were normal (R. 326).

Plaintiff was examined by Dr. Cincinnati on October 26, 2011. Plaintiff's left shoulder range of motion was ninety (90) degrees of forward flexion; he was neurovascularly intact. Dr. Cincinnati instructed Plaintiff to continue physical therapy and prescribed Percocet (R. 394).

Plaintiff presented to Dr. Yalamanchili on November 1, 2011, with no "specific medical

issues." Plaintiff told Dr. Yalamanchili his employer would "not give[] him disability." Dr. Yalamanchili volunteered to provide Plaintiff's medical records to his lawyer (R. 244).

During Plaintiff's evaluation at the VA, on November 8, 2011, Plaintiff reported he did not medicate his lumbar pain; he used a TENS unit. Prolonged standing exacerbated his pain (R. 360). Plaintiff's forward flexion range of motion was ninety (90) degrees with pain at eighty-five (85) degrees. Plaintiff's extension and bilateral lateral flexion were thirty (30) degrees (R. 361). Plaintiff's strength in his lower extremities was 5/5 throughout. He had no muscle atrophy (R. 364). His lower extremity sensory exam was normal (R. 365).

On November 23, 2011, Plaintiff informed Dr. Reyna that physical therapy "help[ed]" and his pain was "better most part." His mood was "better"; he was "more optimistic." Dr. Reyna's review of Plaintiff's systems produced normal results (R. 316). Plaintiff medicated with Lipitor, Nexium, vitamin D, Celexa, and Hydrocodone. He had decreased range of motion of his neck and back pain (R. 318). Dr. Reyna diagnosed mixed depression with anxiety, vitamin D deficiency, and C5-C7 level spinal cord injury with complete lesion of spinal cord (R. 319).

On November 23, 2011, Plaintiff informed Dr. Cincinnati that he was "doing well." Plaintiff's left shoulder range of motion was "about 110 degrees of active forward flexion." Dr. Cincinnati instructed Plaintiff to "discontinue his shoulder immobilizer" and prescribed Percocet. Dr. Cincinnati instructed Plaintiff to continue participating in physical therapy (R. 393).

Plaintiff reported to Dr. Cincinnati, on December 21, 2011, that he was "doing okay" and "making good progress" with surgery recovery. "His cervical problems [were] kind of interfering with his therapy." Plaintiff had "great range of motion" of his left shoulder. Dr. Cincinnati prescribed Lortab and instructed Plaintiff to continue physical therapy (R. 392).

On January 20, 2012, Thomas Lauderman, DO, reviewed Dr. Lateef's September 22, 2011, physical residual functional capacity assessment and affirmed same (R. 72-74.)

On February 8, 2012, Plaintiff informed Dr. Cincinnati that his left shoulder was "doing better" and he was making "slow but steady progress with his therapy." Plaintiff's range of motion in his left shoulder was "functional." Plaintiff was instructed to continue physical therapy and to medicate with Lortab "periodically" (R. 391).

On March 12, 2012, Dr. Shakesprere, a doctor at the VA, examined Plaintiff for neck and back pain. Plaintiff medicated with Lorcet, from which he was trying to "wean off" (R. 339, 342). Plaintiff's examinations were normal, except for a "mild" decrease of his left leg straight leg raising test (R. 339-40). He had no weakness or numbness in his limbs; he had no anxiety (R. 339). Plaintiff's pain score was five (5) in his back (R. 341). Dr. Shakesprere noted Plaintiff medicated with Atorvastatin, Diazepam, and Hydrocodone, none of which were prescribed by the doctors at the VA. Dr. Shakesprere diagnosed chronic back pain, degenerative joint disease of his spine, and hyperlipidemia and prescribed Gabapentin (R. 400).

On March 21, 2012, Plaintiff informed Dr. Cincinnati that his left shoulder was "doing better." He did not participate in physical therapy because it was denied. Upon examination, Dr. Cincinnati found Plaintiff's range of motion was "functional." Dr. Cincinnati instructed Plaintiff to continue to exercise; he was "off all of his pain medications now" (R. 390).

On July 25, 2012, Dr. Yalamanchili wrote a letter addressed "To Whom It May Concern," asserting therein that Plaintiff had "severe cervical spinal stenosis with spinal cord damage (myelomalacia) in 2006." Plaintiff had undergone decompression for this condition, but the extremity weakness and numbness he experienced had not resolved (R. 419).

13

Plaintiff presented to Dr. Cincinnati on August 31, 2012, with complaints of left shoulder pain. Plaintiff's left shoulder range of motion was one-hundred, sixty (160) degrees of forward flexion. He was positive for pain and weakness. Dr. Cincinnati prescribed Lortab (R. 389).

Plaintiff's September 7, 2012, left shoulder MRI showed prior rotator cuff repair with supraspinatus tendinopathy and no "definite retear" and "[t]hinning of the proximal long head of biceps tendon toward its labral insertion, suggesting a partial tear" (R. 411).

On September 7, 2012, Dr. Cincinnati reviewed Plaintiff's left shoulder MRI, which showed tendinitis. He injected Plaintiff's left shoulder with Depo-Medrol (R. 387).

Plaintiff informed Dr. Cincinnati, on November 16, 2012, that he had realized relief from left shoulder pain "for a few days, maybe a little while longer" after his last Depo-Medrol injection. The pain was now "back to where it was before." Dr. Cincinnati injected Plaintiff's left shoulder with Depo-Medrol and prescribed Lortab (R. 386).

Plaintiff was examined by Dr. Shakesprere on December 12, 2012, for a follow-up examination. He had no "new problem[s]." He had received an "injection in [left] shoulder." Plaintiff asked Dr. Shakesprere about pain management through the VA. Plaintiff had not gotten his prescriptions refilled from his last visit because the medication did not "help him." Dr. Shakesprere informed Plaintiff that medication could be increased slowly (R. 329). Plaintiff currently medicated with Gabapentin. Plaintiff's examination was normal, except for limb weakness (R. 330). He had limited movement in his left shoulder. Plaintiff's pain score was five (5). His main pain was in his back and shoulder (R. 331, 334). Plaintiff rated his pain at five (5) and ten (10) on a scale from one to ten (1-10). Exercising made Plaintiff's pain worse; medication lessened his pain (R. 334). Plaintiff reported he had fallen during the past year (R. 335). Dr. Shakesprere instructed Plaintiff

to exercise (R. 331).

Plaintiff informed Dr. Cincinnati that the last Depo-Medrol injection to his left shoulder provided relief from pain for "about a week or so." Plaintiff had left shoulder pain with range of motion. He was neurovascularly "otherwise intact." Dr. Cincinnati injected Plaintiff's left shoulder with Depo-Medrol and prescribed Lortab (R. 385).

Administrative Hearing

Plaintiff testified he could not work due to low back pain, "implants, corrective surgery, and . . . spinal cord damage" from an assault (R. 36). Plaintiff stated that an injury at work aggravated his cervical symptoms after he had the "cervical correction" (R. 38). Plaintiff stated his left shoulder surgery did not cure his symptoms. Plaintiff was left handed; he experienced numbness and tingling in his arm to his fingers due to his shoulder (R. 39). Plaintiff participated in "extensive physical therapy" (R. 41). Plaintiff stated he had been "falling" (R. 41). Pushing and pulling caused Plaintiff pain (R. 42). Plaintiff could stand for fifteen (15) to twenty (20) minutes; he could walk a block; he could lift no more than ten (10) pounds. There were days Plaintiff could not sit, stand, or lie down; he "walk[ed] around in circles" (R. 45). Plaintiff had to recline in a recliner chair four (4) or five (5) days per week. Plaintiff's "thought process" was negatively affected by his condition (R. 46). Plaintiff stated medication caused dizziness (R. 47). Plaintiff sometimes did not sleep (R. 48).

Plaintiff testified his wife had to occasionally help him dress (R. 40). He needed assistance getting in and out of the shower (R. 41). Plaintiff "sometimes" washed dishes. He did "very little" yard work (R. 42). Plaintiff put clothes in the washer and dryer. Plaintiff played guitar (R. 43). Plaintiff drove once per month (R. 44). Plaintiff visited family and friends (R. 44-45).

The ALJ asked the VE the following hypothetical question:

15

I'm going to ask you to assume a hypothetical individual who can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds; stand and/or walk about six hours in eight, sit about six hour in eight; unlimited in the ability to push and pull, but that would be consistent with light work; can occasionally climb ramps and stairs, ladders, ropes, scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; has no manipulative visual or communicative limitations and no -- but he should avoid . . . concentrated exposure to extreme cold and vibration as well as concentrated heights and dangerous machinery; can such an individual perform work the claimant performed in the past . . . ?(R. 49-50).

The VE responded such an hypothetical person could not perform Plaintiff's past work. The ALJ then asked the VE to "assume he is an individual closing approaching advanced age, that he has a high school education, that he has past work as you have described, the residual functional capacity I just described; are there jobs which exist in significant numbers in the national economy which such an individual could perform?" (R. 50).

The VE stated cashier, retail industry marker, and sales attendant were jobs available to such an individual and gate guard and information clerk as semi-skilled or skilled work (R. 51-52). The ALJ then added "no more than occasional[] reach[ing] overhead with the left upper extremity" and asked if any of the listed jobs would be eliminated, and the VE said they would not (R. 53).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Pierce made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.  The claimant has not engaged in substantial gainful activity since October 16, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: status post-cervical fusion and status post-left shoulder surgery (20 CFR 404.1520(c)) (R. 20).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404,m Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs, but no climbing of ladders, ropes or scaffolds. He must avoid all exposure to temperature extremes, vibration, dangerous machinery, or unprotected heights. He is limited to no more than occasional reaching overhead with the left (dominant) upper extremity (R. 22).

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on February 18, 1958 and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant subsequently changed age category to advanced age (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)) (R. 25).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 16, 2011, through the date of the decision (20 CFR 404.1520(g)) (R. 26).

## IV.  DISCUSSION

**A.     Scope of Review**

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays v. Sullivan, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.     Contentions of the Parties**

Plaintiff contends:

1.     The Administrative Law Judge erroneously assessed the Plaintiff's residual functional capacity.

(Plaintiff's Brief at 3-11.)

The Commissioner contends:

1.     Substantial evidence supports the ALJ's residual functional capacity finding.

(Defendant's Brief at 9-13.)

## C.    Residual Functional Capacity

As his only claim for relief, Plaintiff asserts that the ALJ erroneously assessed his residual functional capacity ("RFC"). (Plaintiff's Brief at 3-4.) First, Plaintiff alleges that the ALJ "failed to include any limitation related to the Plaintiff's ability to move his neck or his head in her residual functional capacity assessment." (Id. at 5.) Second, Plaintiff argues that the ALJ "failed to properly evaluate the opinions of the Plaintiff's treating physician." (Id.) The undersigned has considered each of these arguments in turn.

### 1.    Limitations Regarding Movement of Head and Neck

Plaintiff first claims that the ALJ "failed to properly assess [his] limitations as required pursuant to Social Security Ruling 96-8p." (Plaintiff's Brief at 4.) Specifically, Plaintiff states that "although the Plaintiff's primary impairment concerns the functional limitations related to his four level fusion in his neck, the Administrative Law Judge failed to include any limitation related to the Plaintiff's ability to move his neck or his head in her residual functional capacity assessment." (Id. at 5.) The Commissioner asserts that the ALJ accounted for "all of Plaintiff's functional limitations that were supported by the evidence." (Defendant's Brief at 9.)

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's

RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving his RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. § 404.1545(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

As to Plaintiff's RFC, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs, but no climbing of ladders, ropes or scaffolds. He must avoid all exposure to temperature extremes, vibration, dangerous machinery, or unprotected heights. He is limited to no more than occasional reaching overhead with the left (dominant) upper extremity.

(R. at 22.)

Upon review of the record, the undersigned agrees with the Commissioner that "the record did not support any significant limitations with Plaintiff's ability to move his head or neck." (Defendant's Brief at 10.) On October 5, 2010, P.A. Zuniga noted that Plaintiff had decreased range of motion in his neck. (R. at 264.) Dr. Reyna noted the same on October 20, November 3, and December 13, 2010. (R. at 232, 268, 271.) Dr. Reyna also noted that Plaintiff was positive for neck pain on December 3, 2010. (R. at 273.) He again found decreased range of motion in Plaintiff's neck on January 7, January 28, March 11, April 20, May 16, June 27, August 5, August 23,

September 26, and November 23, 2011. (R. at 278, 282, 286-87, 290, 294, 298, 302, 306, 310, 314, 319.) However, at no time did Dr. Reyna or P.A. Zuniga find any functional limitations related to Plaintiff's ability to move his head or neck.

Furthermore, on January 4, 2011, Plaintiff told Dr. Yalamanchili that he had experienced "excellent relief of his neck pain." (R. at 237.) On February 15, 2011, Plaintiff told Dr. Yalamanchili that his neck pain had "completely resolved." (R. at 238.) On June 2, 2011, staff at the emergency department of West Virginia University Hospitals–East noted a normal examination with normal range of motion. (R. at 215.) Likewise, on March 12, 2012, Dr. Shakesprere examined Plaintiff for neck pain; however, Plaintiff had an normal examination, except for a "mild" decrease of his left leg straight leg raising test. (R. at 339-40.) Finally, on December 12, 2012, Dr. Shakesprere noted a normal examination, except for limb weakness and limited movement in Plaintiff's left shoulder. (R. at 330, 331, 334.) At no time did either Dr. Yalamanchili or Dr. Shakesprere find any functional limitations related to Plaintiff's ability to move his head or neck.

Given this, the undersigned finds that Plaintiff has not met his burden of producing evidence showing that he had functional limitations regarding the ability to move his neck and head. See Hunter, 993 F.2d at 35; see also 20 C.F.R. § 404.1545(a)(3). The undersigned further finds that the ALJ did not err by not including any such limitations in her RFC assessment. Accordingly, Plaintiff's first argument is without merit.

### 2.     Treating Physician's Opinions

Plaintiff next argues that the ALJ "failed to properly evaluate the opinions of the Plaintiff's treating physician." (Plaintiff's Brief at 5.) He first asserts that, regarding Dr. Yalamanchili's opinions dated April 6 and May 3, 2011, the ALJ "failed to evaluate Dr. Yalamanchili's opinions

in any manner, and failed to provide any explanation why these opinions should not be adopted."

(Id. at 6-7.) Plaintiff also alleges that the ALJ "failed to evaluate whether the opinions of Dr. Yalamanchili should be accorded controlling weight," and "failed to properly evaluate the medical opinions of Dr. Yalamanchili apart from the 'controlling weight' analysis." (Id. at 7-8.) According to Plaintiff, this failure was significant, because

> if the Administrative Law Judge had evaluated and accepted the opinions of the Plaintiff's treating physician, the analysis of the Plaintiff's transferable skills would have been altered such that a finding that the Plaintiff possessed skills transferable to sedentary work could only be made if the sedentary work was so similar to the Plaintiff's previous work that very little, if any vocational adjustment would need to be made in terms of tools, work processes, work settings, or the industry.

(Id. at 10.) The Commissioner asserts that the ALJ did not commit error because "Dr. Yalamanchili's April 3, 2011 and May 6, 2011 opinions pre-dated the relevant period in this case and were consistent with the ALJ's ultimate finding of non-disability." (Defendant's Brief at 13.)

20 C.F.R. § 404.1527(c) states:

*How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Likewise, 20 C.F.R. § 404.1527(f)(2)(I) provides:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence except for the ultimate determination about whether you are disabled.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig, however, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

> When the determination or decision:

> *is not fully favorable, e.g., is a denial; or

> *is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). "[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

Regarding Dr. Yalamanchili's opinions, the ALJ wrote:

> In a letter dated January[3] 25, 2012, Dr. Yalamanchili stated that the claimant's symptoms of extremity weakness and numbness have not resolved as of the date of the letter due to the permanent spinal cord injury he experienced and for which he underwent decompression surgery (Exhibit 10F). The opinion of a treating physician or psychologist concerning the nature and severity of an impairment is entitled to controlling weight pursuant to SSR 96-2p, that is, if it is well-supported and not internally inconsistent or inconsistent with other pertinent clinical evidence. However, speculation as to employability carries no valuable probative weight, and the ultimate determination of disability is specifically reserved to the Commissioner pursuant to SSR 96-5p. This opinion is given limited weight because it does not offer any functional limitations that result from the claimant's symptoms. A degree of limitation greater than that given in the residual functional capacity is not borne out by reduced strength of only 4-5 strength on physical examination with normal sensation. It is further belied by normal strength and sensation as noted by Dr. Nathan.

(R. at 24-25.)

---

[3] The letter is actually dated July 25, 2012. (R. at 419.)

It is clear that the ALJ did not mention Dr. Yalamanchili's April 6 and May 3, 2011, opinions in her analysis. Nevertheless, assuming *arguendo* that the ALJ erred, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate disability determination." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008); see also Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) ("The doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); Hurtado v. Astrue, C/A No. 1:09-1073-MBS-SVH, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) ("[T]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision.").

The regulations provide that if a claimant is working at substantial gainful activity, the Administration cannot find that claimant disabled "regardless of . . . medical condition or . . . age, education, and work experience." 20 C.F.R. § 404.1520(b). During his hearing, Plaintiff acknowledged working at the substantial gainful activity level through October 15, 2011, and amended his alleged onset date to be October 16, 2011. (R. at 33, 35.) Therefore, regardless of any medical opinions concerning Plaintiff's limitations, the ALJ could not legally find Plaintiff to be disabled prior to October 16, 2011.

Furthermore, evaluation of Dr. Yalamanchili's April 6 and May 3, 2011 opinions would not have changed the ALJ's decision. On April 6, 2011, Dr. Yalamanchili wrote that Plaintiff was "still recuperating form the spinal cord damage that was done with his initial injury" and that he could "not go back to work on an unrestricted basis should that require lifting/pushing/pulling over 10 pounds." (R. at 229.) On May 3, 2011, he wrote that "[a]t this point, I think that he had a permanent spinal cord injury, which will require him to stay on his current work restrictions permanently." (R.

at 240.) At no time did Dr. Yalamanchili opine that Plaintiff had functional limitations that completely precluded him from substantial gainful activity. Rather, his opinions were that Plaintiff could not perform his prior work as a park ranger. These opinions were consistent with the ALJ's finding that Plaintiff could not perform his past relevant work.

As noted above, Plaintiff asserts that Dr. Yalamanchili's April 3, 2011 opinion that Plaintiff could only lift, push, and pull not more than ten (10) pounds required an analysis of his transferable skills that the ALJ did not perform. (Plaintiff's Brief at 10-11.) In other words, Plaintiff alleges that Dr. Yalamanchili's opinion restricted him to sedentary work, which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). However, Plaintiff's assertion that the ALJ failed to perform this analysis is belied by the record. During the hearing, the following colloquy occurred:

> ALJ: If the claimant is unable to perform his past relevant work, assume he is an individual closely approaching advanced age, that he has a high school education, that he has past work as you have described, the residual functional capacity I just described; are there jobs which exists in significant numbers in the national economy which such an individual could perform? If so, please describe those jobs and the number of jobs in the region of the claimant's residence and in the national economy.

> VE: Yes, ma'am. Light work available to such an individual would include work such as cashiering work, specifically Cashier II, the simplest of cashiering positions. The DOT is 211.462-010. There are in excess of 1.5 million such positions in the national economy and approximately 12,000 in the regional economy, with the region being the state of West Virginia. Also work as a marker specific to the retail industry. DOT is 209.587-034. There are approximately 450,000 such positions in the national economy and approximately 6,000 regionally. And finally, work as a sales attendant. DOT is 299.677-010. Approximately 195,000 in the national economy and approximately 1,500 regionally. Those are representative examples of light work all with SVPs of 2 consistent with the descriptions provided in the Dictionary of Occupational Titles.

ALJ:     Assuming again the claimant is unable to perform his past work, assume this hypothetical individual is of advanced age, with a high school education, with the past work you've described, and the residual functional capacity for light work with the non-exertionals that I indicated, are there any semi-skilled or skilled occupations such individual could perform which requires skills the claimant acquired in his past relevant work but no additional skills, that is the special vocational preparation for the identified occupations, if any, should be equal to or less than the SVP of the past relevant work with the identified skills?

VE:      Yes, ma'am.   Skills acquired would include acquiring, evaluating, communicating information, research and organizing and preparing information, dealing with customers or issues and concerns, teaching those same people.  I think some basic clerical skills would be involved, and also things like inspecting.  Skills that–or positions that those skills would transfer to would include work such as a gate guard.  The DOT is 372.667-030.  There are approximately 162,000 such positions in the national economy and approximately 3,000 regionally.  Also, work–

ALJ:     What's the SVP of that?

VE:      That would be a 3.  Also work as a security guard, 372.667-034, also an SVP of 3.   There are approximately 250,000 in the national economy and approximately 5,000 regionally.  Would you care for another one?

ALJ:     If you can get me one, that'd be good.

VE:      Work as an information clerk, which is a sedentary position, 237.367-022, 140,000 in the national economy and approximately 2,500 regionally.  All those are representative examples of light or sedentary, all with SVPS–the information clerk would be SVP of 4, the other gate guard and the security guard would be SVPs of 3, and all of those are consistent with the descriptions provided in the Dictionary of Occupational Titles.

(R. at 50-53.)  The ALJ memorialized this colloquy in her decision:

The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work but no additional skills.  The vocational expert responded and testified that representative occupations such an individual could perform include: gate guard (DOT Code 372.667-030; light strength demands; SVP 3; 162,00 such jobs in the national economy and 3,000 locally), security guard

29

(372.667-034; light strength demands; SVP 3; 250,000 and 5,000), and information clerk (237.367-022; sedentary strength demands; SVP 4; 140,000 and 2,500).

(R. at 25-26.) Given this, there is no merit to Plaintiff's argument because the ALJ's failure to consider Dr. Yalamanchili's April 3 and May 6, 2011 opinions was "inconsequential to the ultimate disability determination." Tommasetti, 533 F.3d at 1038.

To the extent that Plaintiff asserts that the ALJ erred in assigning limited weight to Dr. Yalamanchili's July 25, 2012 opinion, the undersigned finds that such argument is meritless. In that opinion, Dr. Yalamanchili stated:

> Mr. William Banks had severe cervical spinal stenosis with spinal cord damage (myelomalacia) in 2006. He underwent surgery for decompression of the spinal cord at that time. His symptoms of extremity weakness and numbness have not resolved as of this date due to the permanent spinal cord injury that he suffered initially.

(R. at 419.) The ALJ correctly noted that this opinion did not provide any functional limitations resulting from Plaintiff's impairments. (R. at 24.) Furthermore, Dr. Yalamanchili's mention of "extremity weakness and numbness" is contradicted by his own treatment notes, which often noted that Plaintiff had normal or slightly reduced strength and normal sensation. (R. at 235, 236, 237, 238, 240.) Furthermore, this mention is contradicted by Dr. Nathan's treatment notes from May 10, 2011, which noted good strength and normal sensation. (R. at 207.)

In sum, the undersigned finds that Plaintiff has not met his burden of producing evidence showing that he had functional limitations regarding the ability to move his neck and head, and therefore the ALJ did not err by not including such limitations in her RFC assessment.. See Hunter, 993 F.2d at 35; see also 20 C.F.R. § 404.1545(a)(3). Furthermore, the ALJ did not err by assigning limited weight to Dr. Yalamanchili's July 25, 2012 opinion, and, assuming *arguendo* that the ALJ erred by failing to mention his April 3 and May 6, 2011 opinions, such error was harmless.

## V.  RECOMMENDED DECISION

For the foregoing reasons, I find that the Commissioner's decision denying the Plaintiff's application for DIB is supported by substantial evidence.  I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 3 day of December , 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE